COMMONWEALTH vs. FREDERICK D. DELVERDE.

Essex.  January 9, 1986. — August 21, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal,* Plea, Agreement between prosecutor and defendant, Competency to stand trial. *Homicide. Mental Health. Due Process of Law,* Competency to stand trial, Plea, Mental health. *Incompetent Person,* Plea to criminal charge. *Practice, Civil,* Commitment of mentally ill person.

With respect to a criminal defendant found to be incompetent, by reason of mental retardation, to stand trial on an indictment charging him with murder, the doctrine of substituted judgment was not applicable to permit a guardian appointed for him to enter on his behalf a plea of guilty to so much of the indictment as charged manslaughter, pursuant to a plea arrangement agreed upon by defense counsel, the guardian, and the prosecutor. [294-300]

Discussion of the status of a defendant who has been civilly committed following a judicial determination of his incompetence to stand trial on serious criminal charges. [301-303]

INDICTMENT found and returned in the Superior Court Department on March 25, 1980.

A hearing on the defendant's competency to stand trial was held before *Paul K. Connolly,* J., and a question of law was reported by him to the Appeals Court. The Supreme Judicial Court transferred the case on its own initiative.

*Carmen A. Frattaroli & Robert A. Ledoux* for the defendant.

*Dyanne Klein Polatin,* Assistant District Attorney (*Kevin M. Mitchell,* Assistant District Attorney, with her) for the Commonwealth.

The following submitted briefs for amici curiae:

*William J. Leahy & Brownlow M. Speer* for Committee for Public Counsel Services.

*David C. Casey, Matthew Feinberg & John Reinstein* for Civil Liberties Union of Massachusetts & another.

*Robert H. Weber & David Engle* for Mental Health Legal Advisors Committee.

*Earl Howard & Stan Dietzler-Goldman* for Department of Mental Health.

ABRAMS, J. In this case, we are asked to extend the doctrine of substituted judgment to permit an incompetent criminal defendant to enter a plea of guilty to a charge of manslaughter. Such permission, we are told, would uphold the integrity of the incompetent individual, allow him to exercise rights guaranteed by the Constitution of the United States and the laws of the Commonwealth, and relieve him of a fate of permanent and uncertain incarceration.[1] We conclude that the substituted judgment procedure is inappropriate and unnecessary to protect the rights of the defendant.

We summarize the statement of agreed facts. The defendant, Frederick D. DelVerde, was born in 1962 in Fort Lauderdale, Florida, of parents who had escaped from a Massachusetts State mental health institution. Several months later, due to the limited abilities and retarded condition of his parents, Del-Verde was placed in foster home care. Since then, he has generally been either institutionalized or in foster care, both

---

[1] The Commonwealth did not file a brief, but joined in DelVerde's brief to request approval of substituted judgment for this case. The ward's guardian appeared at oral argument and spoke generally in favor of the request. Briefs in opposition to the defendant's and Commonwealth's request were filed by Civil Liberties Union of Massachusetts and Massachusetts Association of Criminal Defense Lawyers; Mental Health Legal Advisors Committee; Committee for Public Counsel Services, and the Massachusetts Department of Mental Health as amici curiae. Although the briefs of the amici were extraordinarily thorough and helpful to us in our consideration of the case, no party was charged with representing the ward's interests in opposition to the request made on his behalf. We do not doubt the good faith judgment of DelVerde's counsel and guardian to try to protect his interests through substituted judgment. Nevertheless, in view of the novelty and gravity of the issue presented and the non-adversarial posture of the Commonwealth and the defendant, a guardian ad litem should have been appointed, sua sponte or on motion, to present all reasonable arguments against use of substituted judgment. See *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 735 (1977). Because we conclude that substituted judgment should not be permitted, DelVerde was not prejudiced by the lack of formal representation of his interests in opposition.

in Florida and in Massachusetts. He has a long history of mental retardation, diagnosed shortly after birth, and has, from time to time, been evaluated as having an IQ of between 47 and 55.

On February 9, 1980, DelVerde was arrested for, and gave a confession to, murder and rape. At his arraignment, he was ordered to be seen by Dr. Robert Ferrell regarding the issue of his competency to stand trial. On the basis of Dr. Ferrell's oral report, the court ordered DelVerde committed to the Bridgewater State Hospital for a competency examination pursuant to G. L. c. 123, § 15 (b).[2] On March 20, 1980, and again on December 9, 1980, two psychiatrists at Bridgewater evaluated DelVerde as competent to stand trial. On February 23, 1981, the case proceeded to trial in the Superior Court, and an evidentiary hearing was held on DelVerde's pretrial motion to suppress the confession. On the fourth day of testimony, one of the psychiatrists from Bridgewater reversed his opinion on competency and testified that DelVerde was now not competent to stand trial. He was again ordered committed to Bridgewater for a competency evaluation under G. L. c. 123, § 15 (b), and found incompetent. On periodic examination over the next several years, DelVerde once was found competent to stand trial, but otherwise was found incompetent to stand trial. On September 16, 1982, following a hearing on the Commonwealth's petition for commitment under G. L. c. 123, § 16 (b) and (c), the court found that DelVerde was mentally ill, incompetent to stand trial, and that failure to retain him in strict security would create a likelihood of serious harm. He therefore ordered DelVerde committed to Bridgewater for a period of six months.[3]

---

[2] General Laws c. 123, § 15, was amended by St. 1985, c. 617, effective March 23, 1986. The amendment does not affect any of the issues in this case.

[3] In the statement of agreed facts, DelVerde and the Commonwealth characterize the judge's September 16, 1982, order as "committ[ing] the Defendant to MCI Bridgewater for one (1) day to life, with a six (6) month initial review." The text of the order does not indicate a commitment period of one day to life, nor would such an order be permissible under G. L. c. 123, § 16. See discussion *infra* at 301-303. Although a person who has been

On March 8, 1985, after hearing, a judge of the Superior Court specifically found DelVerde not competent to stand trial by reason of mental defect (retardation). Additional medical testimony elicited at the hearing established that there was no reasonable likelihood that DelVerde will ever become competent to stand trial. Thereafter, DelVerde, through his defense counsel and through his guardian, reached a plea bargain agreement with the Essex County district attorney's office, and offered to plead guilty to a reduced charge of manslaughter by use of the substituted judgment doctrine. The judge refused to accept the offer of plea, but agreed to retain jurisdiction and report the following issue to the Appeals Court:

> "Whether a defendant, who has been charged with a crime(s), and has been found incompetent by a Superior Court Justice by reason of mental retardation (and not mental illness), and for whom the medical evidence indicates that there is no expectation that he will ever become competent to stand trial, and who has a Guardian appointed pursuant to M. G. L. c. 201, Sec. 6A, can offer to enter a plea of guilty through his Guardian on an agreed upon plea bargaining and recommendation of sentence, and have it accepted by the Superior Court pursuant to the doctrine of substituted judgment."

We transferred the case here on our own motion. We now answer the reported question, "No."

Before we begin our analysis, it would be helpful to summarize DelVerde's argument. He asserts that a criminal defendant found incompetent to stand trial and who is likely to remain that way for life faces a permanent denial of certain constitu-

---

convicted of a sexual assault crime and who has been adjudicated a "sexually dangerous person" may be sentenced for an indeterminate period of one day to life, G. L. c. 123A, § 5, as amended through St. 1985, c. 752, DelVerde has neither been convicted nor adjudicated sexually dangerous. This case therefore involves only the procedures under the civil commitment statute, G. L. c. 123. See *Thompson v. Commonwealth,* 386 Mass. 811, 814 n.3 (1982).

tional rights, including specifically his Sixth Amendment rights to a speedy trial, to an impartial jury, and to confront witnesses. The incompetent defendant is also denied equal protection of the laws because he is unable to plea bargain with the prosecutor, as allowed under Mass. R. Crim. P. 12, 378 Mass. 866 (1979). In noncriminal cases, Massachusetts and other States have allowed an incompetent person to exercise his or her rights through application of the doctrine of substituted judgment. See, e.g., *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728 (1977), and cases cited. It would be a "natural extension" of this substituted judgment doctrine to allow an incompetent ward to plea bargain with a prosecutor and enter a guilty plea through his guardian in a criminal case where the defendant faces an alternative likelihood of an indefinite, perhaps even lifetime, commitment. DelVerde contends that "if [he] were competent, and taking into account his present and future incompetency, there is no doubt he would accept this offer of a reduced charge of manslaughter and enter a guilty plea."

1. *Constitutional rights of the incompetent defendant.* "It has long been the law of this Commonwealth that the 'trial, conviction or sentencing of a person charged with a criminal offence while he is legally incompetent violates his constitutional rights of due process' (footnote omitted), whether under the Fourteenth Amendment to the Constitution of the United States or under art. 12 of the Declaration of Rights of the Constitution of this Commonwealth. *Commonwealth* v. *Vailes,* 360 Mass. 522, 524 (1971)." *Commonwealth* v. *Hill,* 375 Mass. 50, 51-52 (1978). The same considerations apply when the judgment of conviction and the sentence are based not on a verdict of guilty following trial but on the defendant's plea of guilty. See *Commonwealth* v. *Leate,* 367 Mass. 689, 696 (1975). When a criminal defendant pleads guilty, he waives his right to be convicted by proof beyond a reasonable doubt, *In re Winship,* 397 U.S. 358, 364 (1970), his Fifth Amendment privilege against self-incrimination, his right to stand trial by jury, and his right to confront his accusers. *Boykin* v. *Alabama,* 395 U.S. 238, 243 (1969). "Because a plea of guilty involves

these constitutional rights, the plea is valid only when the defendant offers it voluntarily, with sufficient awareness of the relevant circumstances, *Brady* v. *United States,* 397 U.S. 742, 748-749 (1970), and with the advice of competent counsel. *Id.* at 758." *Commonwealth* v. *Fernandes,* 390 Mass. 714, 715-716 (1984). See *Commonwealth* v. *Leate, supra* at 694. "[A] guilty plea is void if it is involuntary and unintelligent for any reason." *Huot* v. *Commonwealth,* 363 Mass. 91, 96 (1973). A plea is neither voluntary nor intelligent "unless the defendant received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Henderson* v. *Morgan,* 426 U.S. 637, 645 (1976), quoting *Smith* v. *O'Grady,* 312 U.S. 329, 334 (1941).

There is no question in this case that, under these standards, a plea of guilty by DelVerde would not be valid. The psychiatrist who examined him several weeks prior to the offered plea testified that DelVerde "does not understand the nature of the proceedings against him, is not really clear in his own position and relationships to the proceedings, and [ ] he, at this time, cannot rationally assist counsel in the preparation and implementation of his own defense." The psychiatrist further testified that, because of DelVerde's mental retardation, a waiver of his constitutional rights could not be described as voluntary, knowing, or intelligent.[4]

Defense counsel and the guardian may not waive DelVerde's rights for him. "[I]t is too late in the day to permit a guilty plea to be entered against a defendant solely on the consent of the defendant's agent — his lawyer. . . . [T]he choice to

---

[4] At least one commentator questions the "assumption that the Constitution places an absolute prohibition on trying the incompetent defendant" or accepting his plea of guilty. Winick, Restructuring Incompetency to Stand Trial, 32 U.C.L.A. L. Rev. 921, 926 (1985). Although Professor Winick advocates acceptance of guilty pleas from some incompetent defendants, he cautions, "this should only be done when the defendant can express clearly and unequivocally his desire to do so, and his attorney concurs." *Id.* at 973. Even under this proposed standard, there is no showing that DelVerde has expressed a preference to plead guilty or that he even has the capacity to do so in a clear and unequivocal manner.

plead guilty must be the defendant's: it is *he* who must be informed of the consequences of his plea and what it is that he waives when he pleads, *Boykin* v. *Alabama,* 395 U.S. 238 (1969); and it is on his admission that he is in fact guilty that his conviction will rest" (emphasis in original). *Henderson* v. *Morgan, supra* at 650 (White, J., concurring).

2. *Doctrine of substituted judgment.* The doctrine of substituted judgment originated in England to authorize a gift from the estate of an incompetent person to an individual to whom the incompetent owed no duty of support. *Ex parte Whitbread in re Hinde, a Lunatic,* 35 Eng. Rep. 878 (1816). The doctrine first appeared in this Commonwealth in legislation empowering the Probate Court to authorize a conservator or guardian to formulate and administer an estate plan for an incompetent. G. L. c. 201, § 38, as amended by St. 1969, c. 422. See *Strange* v. *Powers,* 358 Mass. 126 (1970). The first common law application in Massachusetts of the substituted judgment doctrine was in *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728 (1977), in which we approved the withholding of life-prolonging medical treatment to an elderly mentally retarded person suffering from acute myeloblastic monocytic leukemia. To our knowledge, apart from proceedings under G. L. c. 201, § 38, all subsequent cases in Massachusetts in which substituted judgment has been used have involved either the withholding or forced administration of medical treatment. See *Rogers* v. *Commissioner of the Dep't of Mental Health,* 390 Mass. 489 (1983) (use of antipsychotic drugs); *Custody of a Minor (No. 1),* 385 Mass. 697 (1982) (withholding of life-prolonging treatment in case of a terminally ill and abandoned child); *Matter of Moe,* 385 Mass. 555 (1982) (sterilization); *Guardianship of Roe,* 383 Mass. 415 (1981); *Matter of Spring,* 380 Mass. 629 (1980) (withholding of life-prolonging treatment); *Matter of Hier,* 18 Mass. App. Ct. 200 (1984). As used in the medical treatment area, the substituted judgment procedure vindicates the incompetent's common law interest in being free from nonconsensual invasion of his bodily integrity and the unwritten constitutional right of privacy found in the penumbra of specific guarantees of the Bill of Rights.

*Saikewicz, supra* at 739. *Griswold* v. *Connecticut,* 381 U.S. 479, 484 (1965).

"In utilizing the doctrine of substituted judgment, this court seeks to maintain the integrity of the incompetent person by giving the individual a forum in which his or her rights may be exercised. The court dons 'the mental mantle of the incompetent' and substitutes itself as nearly as possible for the individual in the decision making process. *Saikewicz, supra* at 752, quoting *In re Carson,* 39 Misc. 2d 544, 545 (N.Y. Sup. Ct. 1962)." *Matter of Moe, supra* at 565.

The substituted judgment procedure is as follows. The guardian who seeks on behalf of the ward authorization to make a decision (which he would not otherwise be authorized to make) petitions the court. The court appoints a guardian ad litem, whose responsibility is to attempt to ascertain the incompetent person's actual interests and preferences. *Saikewicz, supra* at 752. The judge must then find as fact the decision "which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person." *Id.* at 752-753. "[T]he court does not decide what is necessarily the best decision but rather what decision would be made by the incompetent person if he or she were competent. 'In short, if an individual would, if competent, make an unwise or foolish decision, the judge must respect that decision as long as he would accept [or be bound to accept] the same decision if made by a competent individual in the same circumstances.' *Guardianship of Roe,* [383 Mass. 415,] 449 n.20 [1981]." *Matter of Moe, supra* at 565. See also *Rogers, supra* at 500. Finally, the judge must determine whether the countervailing State interests are so substantial as to outweigh the individual's right to make and pursue the decision. *Saikewicz, supra* at 740-741. This latter step applies, of course, anytime the State seeks to override individual rights, regardless of the individual's competency. *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 261 (1979). This specific sequence of steps — ascertaining the ward's choice, followed

by a balancing of individual and State interests — reflects the fundamental principle that where the the individual's common law and constitutional rights to bodily integrity and privacy are at stake, the individual enjoys a sphere of autonomy, free from governmental interference except in very limited circumstances. See *Roe* v. *Wade,* 410 U.S. 113, 152-155 (1973); *Eisenstadt* v. *Baird,* 405 U.S. 438, 453 (1972); *Griswold* v. *Connecticut,* 381 U.S. 484 (1965); *Olmstead* v. *United States,* 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting); *Rogers, supra* at 511; *Guardianship of Roe, supra* at 449. See also L. Tribe, American Constitutional Law 914 (1978).

As we previously observed, apart from its statutorily-authorized use in estate administration, the substituted judgment procedure has been used only in medical treatment cases. On general principles, it may be appropriate to use the procedure any time that an incompetent person risks denial of a fundamental right simply because he is unable to make or express a decision. The precise question in this case, however, is whether the substituted judgment procedure may be used to allow an incompetent criminal defendant to plead guilty. We answer "No," because a decision to plead guilty made by way of substituted judgment cannot supply the factual proof of guilt needed to convict a criminal defendant, and because an incompetent defendant's inability to plea bargain does not result in a denial of any of his rights.

3. *Proof of factual guilt.* The judge, in denying DelVerde's request, stated, "The reason I will not accept the plea of guilty is, and a fundamental one, the defendant either is guilty or not guilty, depending upon his criminal responsibility at the time of the commission of the crime. And I am not going to permit the guardian to enter a plea of guilty to a crime that he did not commit if he were not criminally responsible." The judge correctly recognized that, at most, substituted judgment may indicate a preference for a particular plea bargain, but it cannot cure deficiencies in the Commonwealth's case on the issue of mental responsibility for the offense.

A defendant's choice to plead guilty will not alone support conviction; the defendant's guilt in fact must be established.

See *Henderson* v. *Morgan,* 426 U.S. 637, 648 (1976) (White, J., concurring); *Commonwealth* v. *McGuirk,* 376 Mass. 338, 342-343 (1978), cert. denied, 439 U.S. 1120 (1979). Other than by a verdict of guilty after trial, there are two constitutionally permissible ways to establish factual guilt: an "admission of guilt in open court, or a plea of guilty accompanied by a claim of innocence in accordance with the standards of *North Carolina* v. *Alford,* 400 U.S. 25 (1970)." *McGuirk, supra* at 343. Under *Alford,* a defendant who professes innocence may nevertheless plead guilty and "voluntarily, knowingly and understandingly consent to the imposition of a prison sentence," if the State can demonstrate a "strong factual basis" for the plea. *Alford, supra* at 37-38. Whether the defendant admits to the crime in open court, or the Commonwealth shows the factual basis for the plea, a court may not convict unless there are sufficient facts on the record to establish each element of the offense. See *Henderson, supra* at 645-646; *Santobello* v. *New York,* 404 U.S. 257, 261 (1971); *McGuirk, supra.*

Manslaughter has long been defined in this Commonwealth as "the unlawful killing of another without malice." *Commonwealth* v. *Webster,* 5 Cush. 295, 304 (1850). Whether the manslaughter is voluntary[5] or involuntary,[6] intent to cause the

---

[5] "Manslaughter is the unlawful killing of another without malice; and may be . . . voluntary, as when the act is committed with a real design and purpose to kill, but through the violence of sudden passion, occasioned by some great provocation . . . . [T]he characteristic distinction between murder and manslaughter is malice . . . ." *Commonwealth* v. *Webster,* 5 Cush. 295, 304 (1850). Thus, voluntary manslaughter is an intentional act mitigated by sudden passion based on provocation. "The factor that distinguishes voluntary manslaughter from murder is not the absence of intent, but rather the absence of malice aforethought." *Commonwealth* v. *Hebert,* 373 Mass. 535, 541 (1977) (Quirico, J., concurring).

[6] Involuntarily manslaughter is an unlawful homicide unintentionally caused in either of two ways: "(1) in the commission of an unlawful act, malum in se, not amounting to a felony nor likely to endanger life . . . or (2) by an act that constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct." *Commonwealth* v. *Campbell,* 352 Mass. 387, 397 (1967), and cases cited. "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to

death of the victim need not be shown. However, the act which resulted in death must be shown to have been intentional. *Commonwealth* v. *Bouvier,* 316 Mass. 489, 495 (1944). The defendant must be proved to have been mentally responsible for the crime. *Commonwealth* v. *McHoul,* 352 Mass. 544, 548 (1967). See *Commonwealth* v. *Nassar,* 380 Mass. 908, 914 (1980) (mental capacity for manslaughter). DelVerde cannot, consistent with the Constitution, admit to mental responsibility for the crime. The substituted judgment procedure cannot remedy that deficiency. The substituted judgment procedure is designed to ascertain preferences for future treatment, not to find past facts. Even if there exists a strong factual basis to show that DelVerde committed the acts of which he is accused, on this record, his mental responsibility for those acts is in serious doubt. Therefore, a plea to the offense by use of substituted judgment would be inappropriate.

4. *Incompatability of substituted judgment and plea bargaining processes.* Substituted judgment is also inappropriate here because the plea bargaining process involves a set of individual rights and State interests which substituted judgment procedures are ill-suited to serve. To date, all common law applications of substituted judgment have been invoked to protect the incompetent's right to privacy. Here, no privacy issues are involved; moreover, there is no constitutional right to plea bargain, or to have a guilty plea accepted. *Santobello* v. *New York,* 404 U.S. 257, 262 (1971). *North Carolina* v. *Alford,* 400 U.S. 25, 38 n.11 (1970). *Lynch* v. *Overholser,* 369 U.S. 705, 719 (1962).

DelVerde does *not* risk the denial of his Sixth Amendment rights to a speedy trial, an impartial jury, and confrontation of witnesses, nor does he risk denial of the right to plea bargain as provided in Mass. R. Crim. P. 12.[7] Those rights only become operative when the State prosecutes an individual. DelVerde

---

another." *Commonwealth* v. *Gallison,* 383 Mass. 659, 665 (1981), quoting *Commonwealth* v. *Welansky,* 316 Mass. 383, 399 (1944).

[7] DelVerde raises no separate argument under the Massachusetts Declaration of Rights.

has been found incompetent to stand trial and the Commonwealth simply may not try and convict him. Thus, he has no right to a trial, speedy or otherwise, or a right to bargain for his criminal punishment.[8] Indeed, DelVerde does not ask for the exercise of his Sixth Amendment rights, but for permission to waive those rights. Although DelVerde is not without other constitutional rights and statutory rights under G. L. c. 123, there is no showing that he risks loss of those rights if he is unable to plead. Thus, the substituted judgment procedure is unnecessary for the vindication of DelVerde's rights.

Substituted judgment is also inappropriate here because the balance of individual rights and State interests is radically different. In medical treatment decisions, the individual enjoys a zone of privacy into which the government may not intrude except in very limited circumstances in order to protect fundamental social values. By contrast, in plea bargaining, the State itself engages in the decision making process from the beginning. Not in a few, but in all cases, the State interest in the equitable and efficient administration of justice — convicting and punishing the guilty and acquitting the innocent — is implicated. Both the State and the general public have a stake in the outcome of each defendant's decision whether to plead guilty. These interests are pervasive. No plea bargain is free of governmental involvement. The substituted judgment procedure is ill-equipped to accommodate this aspect of the plea process.

The substituted judgment procedure also thrusts the judge into a role inconsistent with his responsibilities as a judge in the criminal justice system. In a substituted judgment proceed-

---

[8] DelVerde analogizes his situation to that of a competent criminal defendant, who may choose to plead guilty in exchange for a potentially more lenient sentence, rather than risk the uncertainties of trial and a possibly more severe sentence. DelVerde's analogy to the plea bargaining choice of a competent criminal defendant misses the mark because the Commonwealth may not prosecute DelVerde so long as he is incompetent. If there is a "choice" available to a competent person comparable to the "choice" faced by DelVerde, it would be a decision to plead guilty to a crime for which the person could not be prosecuted or convicted. No competent person faces such a choice; neither does DelVerde.

ing, the judge steps into the shoes of the incompetent, tries to see everything the incompetent would see, know everything the incompetent would know, and reach the decision the incompetent would reach. Then the judge weighs the incompetent's interests against the limited interests of the State. By contrast, when a judge is presented with a plea, his responsibilities are far different. He does not know, nor does he attempt to know, all the factors the defendant considered in making his decision. Instead, the judge must interrogate the defendant on the record to ascertain whether the plea and its concommitant waiver of rights are knowing, voluntary, and intelligent. *Boykin* v. *Alabama,* 395 U.S. 238 (1969). *Commonwealth* v. *Fernandes,* 390 Mass. 714, 715-716 (1984). *Huot* v. *Commonwealth,* 363 Mass. 91, 96 (1973). He must also determine whether the defendant's admission, or his admission supplemented by the State's offer of proof, demonstrates "a strong factual basis" for the plea. *North Carolina* v. *Alford,* 400 U.S. 25 (1970). In determining whether to accept the plea and in sentencing, the judge must consider a variety of factors, including society's interests and the interests of the victims of the crime. See *Williams* v. *New York,* 337 U.S. 241, 246-247 (1949); *Commonwealth* v. *Coleman,* 390 Mass. 797, 805 (1984); G. L. c. 279, § 4B (1984 ed.); Model Sentencing & Corrections Act, § 3-102, 10 U.L.A. (Master ed. Supp. 1984); J. Ulman, The Trial Judge's Dilemma, Probation and Criminal Justice 109, 113 (S. Glueck, ed. 1933); M.G. Schimm, Foreword, 23 Law & Contemp. Probs. 399 (1958). The judge cannot be expected to discharge these functions with dispassion if he has, in effect, become a party to the plea bargaining process by stepping into a defendant's shoes to determine the defendant's substituted judgment.[9]

---

[9] For example, after engaging in a substituted judgment analysis of a prosecutor's offer, a judge might find that the defendant would have rejected the offer as insufficiently forthcoming. If the prosecutor counters with a more lenient offer, which the defendant accepts, then the judge — acting as judge — would be hard-pressed to exercise independent judgment in accepting the plea and imposing sentence.

*5. Status of the permanently incompetent defendant.* We have concluded, for the foregoing reasons, that a plea of guilty offered by way of substituted judgment should not be accepted because the substituted judgment procedure cannot appropriately be applied to the plea bargaining process. This does not mean, however, that DelVerde is left permanently in limbo, deprived of his liberty and unable either to challenge or secure a determinate end to his commitment. Cf. *Jackson* v. *Indiana,* 406 U.S. 715 (1972). Through G. L. c. 123, the Legislature has created a comprehensive set of procedural and substantive safeguards to ensure that criminal defendants incompetent to stand trial are neither criminally tried nor civilly committed for longer than necessary. See generally *Thompson* v. *Commonwealth,* 386 Mass. 811, 814 (1982); *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271, 275-276 (1978). When a person is found incompetent to stand trial by reason of mental illness or mental defect under G. L. c. 123, § 15 (d), then the court may order the defendant hospitalized for up to forty days for observation and examination. After a hearing, the court may order the defendant committed for another six months if it finds the defendant mentally ill and that discharge of such person "would create a likelihood of serious harm." G. L. c. 123, §§ 8 (*a*) and (*c*), 16 (*b*). See *Commonwealth* v. *Nassar,* 380 Mass. 908 (1980). These requirements must be established by the Commonwealth beyond a reasonable doubt. *Thompson* v. *Commonwealth, supra* at 814. *Superintendent of Worcester State Hosp.* v. *Hagberg, supra* at 276. This is precisely the same standard that applies in cases of civil commitment. G. L. c. 123, §§ 7 & 8. See *O'Connor* v. *Donaldson,* 422 U.S. 563, 576 (1975) (State may not confine person to mental institution on basis of mental illness alone absent some showing of dangerousness to self or others).

Accordingly, DelVerde is in the same position as any other person who has been civilly committed and may exercise the same options to secure his release. For example, he may challenge on periodic review the Commonwealth's contention that he is mentally ill and dangerous. The record does not indicate

that he has done so. Two of the amici curiae, Mental Health Legal Advisors Committee and Department of Mental Health, urge us to find that DelVerde's commitment contravenes c. 123, § 16 (*b*) & (*c*), because he is not "mentally ill." Chapter 123, § 1, specifies that a "mentally retarded person may be considered mentally ill provided that no mentally retarded person shall be considered mentally ill solely by virtue of his mental retardation."[10] See also 104 Code Mass. Regs. § 20.02 (45) (1981). These amici observe that DelVerde has been adjudicated incompetent to stand trial specifically by reason of the mental defect of retardation and not by reason of mental illness. They therefore argue this retardation is itself insufficient to find him "mentally ill" for purposes of continued commitment.

We need not decide this issue. The lawfulness of DelVerde's commitment under § 16 (*b*) was not litigated below and has not been reported to us, and the record is insufficiently developed.[11] Nevertheless, we note that the Commonwealth's most recent petition for commitment under § 16 (b) has been

---

[10] "Mentally retarded person" is defined in G. L. c. 123, § 1, as follows: "a person who, as a result of inadequately developed or impaired intelligence, as determined by clinical authorities as described in the regulations of the department [of mental health] is substantially limited in his ability to learn or adapt, as judged by established standards available for the evaluation of a person's ability to function in the community." The statute does not define "mental illness" but instead delegates to the department of mental health the responsibility to define the term for purposes of c. 123. G. L. c. 123, § 2. Pursuant to that authority, the department issued 104 Code Mass. Regs. § 3.101 (a) (1981), which provides in part: "For purposes of involuntary commitment and the determination of criminal responsibility, 'mental illness' shall mean a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life."

[11] The most recent (January 14, 1985) medical examination report in the record, from the court psychiatrist, states: "From the current evaluation, I did not find overt signs of psychosis or major mental illness and his condition appeared consistent with Mental Retardation." Several prior clinical reports from Bridgewater also concluded that DelVerde does not suffer from mental illness. Certain reports indicate a history of depression, but it is unclear whether that constitutes "mental illness" under 104 Code Mass. Regs. § 3.101 (a). See note 10, *supra*.

stayed pending our decision. Without expressing any opinion on its merits, we observe that the argument suggested by amici is available to DelVerde in that proceeding or in a hearing which he may obtain under c. 123, § 9 (b). See *Thompson* v. *Commonwealth,* 386 Mass. 811, 814-815 (1982). So too Del-Verde is free to argue that his confinement does not meet the second requirement under § 16 (*b*) because his discharge is no longer likely beyond a reasonable doubt to create a risk of serious harm.[12] "[O]nce the conditions justifying confinement cease to exist, the State's power to confine terminates, and the person is entitled to be released." *Thompson, supra* at 816.

6. *Conclusion.* We decline to extend the use of substituted judgment to the plea process. Accordingly, we answer the reported question "No."

---

[12] At oral argument, defense counsel reported that the psychiatrist who examined DelVerde in January, 1985, indicated that if DelVerde committed the crime, he is dangerous; if he did not commit the crime, he is not dangerous. We need not decide whether that opinion alone is a sufficient basis for a legal finding, several years after the alleged crime was committed, that DelVerde currently is dangerous beyond a reasonable doubt.