IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2014 Term

**FILED**

**October 16, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 12-1292

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

JUSTIN SEAN GUM,
Defendant Below, Petitioner.

Appeal from the Circuit Court of Lewis County
Honorable Thomas H. Keadle, Judge
Civil Action No. 10-F-68

AFFIRMED

Submitted:  September 16, 2014
Filed:  October 16, 2014

Thomas J. Prall, Esq.
James E. Hawkins, Jr., Esq.
Buckhannon, West Virginia
Attorneys for Petitioner

Patrick Morrisey, Esq.
Attorney General
Elbert Lin
Solicitor General
Laura Young, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

The right to a jury trial does not attach to a hearing requested pursuant to West Virginia Code § 27-6A-6 (2013) for the purpose of permitting a criminal defendant, who has been adjudged incompetent, to establish any defenses to the charged offense other than the defense of not guilty by reason of mental illness.

LOUGHRY, Justice:

Petitioner Justin Sean Gum (hereinafter "petitioner" or "Mr. Gum") appeals from the September 14, 2012, order of the Circuit Court of Lewis County following a bench trial pursuant to West Virginia Code § 27-6A-6 (2013). The purpose of that proceeding, which the petitioner requested, was to give him the opportunity to establish any defenses to the charged offense of first degree murder, other than not guilty by reason of mental illness. At the conclusion of the subject hearing, the trial court ruled that the State had introduced sufficient evidence to prove only that Mr. Gum could be convicted of second degree murder[1] if this matter were to proceed to trial subsequent to a finding of Mr. Gum's competency to stand trial.[2] Based upon the maximum potential sentence for a conviction of second degree murder,[3] Mr. Gum was determined to be subject to the jurisdiction of the court for forty years.[4] The petitioner asserts constitutional error with regard to the lack of a jury trial in connection with the proceeding under review. Mr. Gum argues additionally that the trial court erred in concluding that sufficient evidence was adduced during the subject civil proceeding to support a conviction of second degree murder. Upon our careful review of the

---

[1]*See* W.Va. Code § 61-2-1(2010).

[2]By previous order of the circuit court, entered on June 13, 2012, Mr. Gum was found not competent to stand trial.

[3]*See* W.Va. Code § 61-2-3 (2010) (imposing ten to forty year sentence as penalty for second degree murder).

[4]This is the longest period of time Mr. Gum could remain in the court's jurisdiction while committed to a mental health facility in connection with the charged offense.

1

submitted record in this case and applicable law, we do not find any error, constitutional or otherwise. Accordingly, the decision of the circuit court is affirmed.

## I. Factual and Procedural Background

On September 19, 2010, following a night of sustained drinking with his father,[5] the petitioner shot his father, James "Jay" Gum, in the chest. The petitioner's father bled to death as a result of the gunshot wound. Through an indictment returned by a grand jury for Lewis County on November 15, 2010, Mr. Gum was charged with first degree murder in connection with his father's shooting.

On June 13, 2012, at the conclusion of a hearing to determine competency, the petitioner was found to be mentally incompetent to stand trial for first degree murder.[6] As part of its ruling, the trial court found that Mr. Gum was "not substantially likely to attain competency and that the indictment against the defendant does involve an act of violence against a person." *See* W.Va. Code § 27-6A-3(h) (2013) (requiring trial court, upon finding of incompetency, to determine offense for which person would have been convicted where

---

[5]The record in this case indicates that Mr. Gum regularly drank fifteen beers a day and consumed even more alcohol on the weekends. At the time of the shooting, Mr. Gum had consumed fifteen to eighteen drinks comprised of either beer or whiskey.

[6]At the end of the competency proceeding, counsel for Mr. Gum filed a written request for a hearing under West Virginia Code § 27-6A-6, and concurrently sought a ruling that the failure to utilize a jury for this proceeding renders the statute unconstitutional.

offense involves act of violence against person[7]).  The petitioner was transported to William R. Sharpe Hospital with directions that the hospital submit an annual report on Mr. Gum's mental condition.

The judicial hearing contemplated by West Virginia Code § 27-6A-6 was held on September 5 and 6, 2012.  The State presented its case against Mr. Gum, introducing multiple witnesses and exhibits[8] for the purpose of demonstrating that the petitioner had committed the offense of first degree murder.[9]  Mr. Gum's co-counsel[10] thoroughly cross-examined each of the five witnesses proffered by the State and offered two defense witnesses–the petitioner's psychiatrist and a firearms expert.

---

[7]We recently held in syllabus point two of *State v. George K.*, __ W.Va. __, 760 S.E.2d 512 (2014), that "[a]n 'act of violence against a person' within the meaning of W.Va. Code § 27-6A-3 (2007) encompasses acts that indicate the incompetent defendant poses a risk of physical harm, severe emotional harm, or severe psychological harm to children."

[8]The exhibits included a 911 tape, which contains statements Mr. Gum made after the shooting incident while trying to procure help for his wounded father, as well as two statements the petitioner gave to the police.

[9]As the trial court commented during its ruling at the end of the hearing:

> I'm not here for the purpose of convicting him of a particular crime, but to decide if it went to trial, what crime could a jury find him guilty of, in order to determine how long this Court retains jurisdiction over him for purposes of placement in a mental institution.

[10]The petitioner was represented by his counsel, Thomas J. Prall and James E. Hawkins, Jr.  Also appearing on Mr. Gum's behalf was a court-appointed guardian ad litem, R. Russell Stobbs.

After all the evidence had been introduced, the trial court reviewed the testimony given by each witness. Looking initially to the testimony of Dr. Thomas R. Adamski, a forensic psychiatrist offered by the State, the trial court considered that Mr. Gum "had a high blood alcohol level, an equivalent of 15 drinks or beers, .24 percent blood alcohol" in his system.[11] While Dr. Adamski did not offer an opinion on Mr. Gum's diminished capacity,[12] he testified, based on general knowledge, that the quantity of alcohol consumed by the petitioner "would affect one's ability to plan and carry out a premeditated plan."[13] Given the petitioner's current diagnosis of paranoid schizophrenia,[14] Dr. Adamski was unable to assist the trial court in determining whether Mr. Gum would have lacked the ability at the time of the shooting to voluntarily give a statement to the police.

---

[11]Given the fact that his blood was not tested until several hours after the incident, several witnesses testified that Mr. Gum's blood alcohol concentration may have been as high as .31 at the time of the shooting.

[12]Addressing his inability to testify regarding the issue of diminished capacity, Dr. Adamski explained that he was not specifically asked by the trial court to offer an opinion on that issue. He limited his examination of Mr. Gum to assessing the issue of competency.

[13]Dr. Adamski agreed with the prosecutor's statement that "if I had no prior plan to commit an act and I consume[d] alcohol to the point that I'm a .24, my ability to plan and to carry out that plan is . . . diminished by virtue of that consumption."

[14]The record indicates that Mr. Gum's psychiatric diagnosis had not been established at the time of the offense in September 2010. Dr. Miller testified that Mr. Gum was not psychotic in February 2011; by May 2011, however, he met the diagnostic qualifications of a paranoid schizophrenic. Dr. Adamski believes, however, that Mr. Gum was suffering from undiagnosed mental illness at the time of the shooting.

4

Dr. Miller, the petitioner's psychiatrist, testified that Mr. Gum was competent to make the second of two statements he gave to the police.[15] Expounding on his finding that Mr. Gum had diminished capacity at the time of his father's shooting, Dr. Miller stated that his "capacity to commit premeditation, malice, [was correlatively] diminished." According to Dr. Miller, it was never Mr. Gum's intention to kill his father. Specifically addressing whether the petitioner had the ability to plan and carry out a premeditated plan of action in light of this diminished capacity, Dr. Miller distinguished between the actions required to execute a physical plan, which involved walking to his father's room to locate the gun and then going downstairs with the gun to retrieve shells from another location, from a premeditated plan to murder his father. Dr. Miller insisted that Mr. Gum's execution of a plan to procure and load a weapon is not the equivalent of having the intent necessary to commit first degree murder.[16]

---

[15]Following *Miranda* warnings, the first statement was given at 6:52 a.m. After being reread those same rights, Mr. Gum provided the police with a second statement at 4:36 p.m. According to Dr. Miller, Mr. Gum had no memory of having given a statement to the police just nine hours earlier.

[16]Dr. Miller was adamant in his testimony that but for an incident a year earlier where the petitioner retrieved a gun to threaten his dad for the specific purpose of procuring additional alcohol, this shooting incident would never have occurred. In his opinion, Mr. Gum was repeating that particular behavior in which he used the weapon in an attempt to scare his father into giving him more alcohol. Dr. Miller expressly rejected the petitioner's ability to perform "executive function," which he defined as "contemplation, formulation, execution and then review of a plan." He stated that "[s]omeone with a blood alcohol level of his [Mr. Gum] is going to be diminished or deficient in one of those [four] areas."

The trial court proceeded to consider the testimony of Robert Davis, Jr., the investigating deputy sheriff who responded to the 911 call made by Mr. Gum. Deputy Davis observed that Mr. Gum "had slurred speech and glassy eyes, but [that] he followed commands and was able to get around fine in the house and outside of the house."[17] The court recounted Deputy Davis' testimony concerning Mr. Gum's statements–specifically, his seeming comprehension of the *Miranda* warnings and his ability to read words that typically give people difficulty.[18] Referencing the two statements that the petitioner gave to Deputy Davis, the trial court related Mr. Gum's explanation of the shooting: "I pointed the shotgun at him, turned my head, and pulled the trigger, I see him coming down the steps, I don't even remember looking at him whenever I pulled the trigger." Summarizing the content of the 911 tape, which was introduced through Deputy Davis,[19] the trial court stated: "The Defendant said the victim was crazy, trying to kill me, he was coming at me, yelling and screaming. The Defendant consistently says he was coming at me. I shot my dad."

---

[17]Based on his long-term history of heavy alcohol consumption, Dr. Adamski testified that the petitioner "is capable of handling very, very large amounts of alcohol, perhaps double what his blood alcohol level was on the day for which he was arrested and charged." He further opined that people with the high alcohol tolerance level suggested by Mr. Gum's drinking history "can act relatively normally with very high blood alcohol levels."

[18]Deputy Davis observed that Mr. Gum, unlike most people, did not stumble on the word "coercion" when reading his *Mirranda* statement back to the officer.

[19]The parties had stipulated to the authenticity of the 911 tape.

Recapping the testimony of Dr. Hamada Mahmoud,[20] the State Medical Examiner, the trial court stated that the cause of death was a shotgun wound to the chest. Dr. Mahmoud indicated that the shot to the victim's right upper chest was made at close range.[21] The victim, according to the results of the toxicology report, had a blood alcohol content of .24 at the time of the shooting.

The testimony of two additional witnesses, Charles Kirkpatrick, a deputy sheriff at the time of the shooting, and Andrew Taylor, a volunteer fire department member, were summarized by the trial court. Mr. Kirkpatrick described how the petitioner, with no prompting, just started talking to him while they were both seated in the basement of the house after the shooting.[22] Mr. Gum related to Mr. Kirkpatrick that he had consumed eight to twelve cans of Bud Light by himself before he went upstairs and drank three or four shots of whiskey with his father. At this point they began to argue:

> He said that his dad started yelling at him and he got very loud
> and he said that he knew where his dad kept his gun, said he –
> his dad continued to get madder and he could see the madness
> in his eyes, basically, is what he explained to me and he said that
> it even got louder and then his dad came at him, the Defendant
> got – and he said that, you know, that – then he got, he just got
> really quiet after that point.

---

[20]He performed the autopsy on the victim.

[21]He based this finding on the discovery of wadding inside the victim's chest cavity.

[22]Mr. Gum lived in the basement section of his father's split-level home.

7

Andrew Taylor testified that Mr. Kirkpatrick was not questioning the petitioner and that everything offered by Mr. Gum was related without any inquiry from Mr. Kirkpatrick.[23]

The final testimony recounted by the trial court was that of William Conrad, a private firearms examiner obtained by the petitioner. Mr. Conrad testified that "the mark on the Defendant's chest is consistent with the size of a shotgun butt end of the stock . . . [and] [i]t is also consistent with the Defendant's statement."[24] The court repeated the statement of Mr. Conrad that this type of gun "had to be cocked before it would fire." Based on this explanation, the trial court reasoned that "[a] jury could assume the Defendant cocked the gun, it wouldn't go off by itself, . . . it has to be cocked and the trigger pulled to fire."

After reviewing the evidence offered by the parties, the trial court proceeded to address the issues of whether the State had introduced sufficient evidence to convict Mr. Gum of first degree murder and whether the petitioner had acted in self defense. After recounting the elements required to prove first and second degree murder, involuntary and voluntary manslaughter, the trial court ruled that there had been insufficient evidence

---

[23]Mr. Taylor confirmed Mr. Kirkpatrick's testimony of how the petitioner inquired at one point whether his dad had made it and, when told no, inquired of Mr. Kirkpatrick regarding the outcome.

[24]Instead of placing the butt of the shotgun under his arm in the shoulder pocket, the typical placement when aiming and shooting this type of a gun, Mr. Gum stated that he had positioned it on his chest just prior to pulling the trigger.

introduced to establish first degree murder. Finding reasonable doubt as to the elements of premeditation and deliberation, the trial court ruled that the evidence adduced, were it to go to a jury, could, however, result in a verdict of second degree murder. Accordingly, the trial court determined that it retained jurisdiction over the petitioner for forty years based on the maximum sentence specified for a conviction of second degree murder.[25] Mr. Gum was remanded to the custody of William R. Sharpe, Jr. Hospital for the duration of that period of time, barring an intervening determination of competency. It is from this ruling that the petitioner now appeals.

## II. Standard of Review

With regard to the petitioner's assertion of unconstitutional error arising from West Virginia Code § 27-6A-6, our review is plenary. *See* Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review"). As to the circuit court's ruling under the statute, we review challenges to the findings and conclusions following a bench trial by applying an abuse of discretion to the final order and disposition while reviewing the underlying factual findings under a clearly erroneous standard. *See* Syl. Pt. 1, *Public Citizen, Inc. v. First Nat'l*

---

[25]*See supra* note 3.

9

*Bank*, 198 W.Va. 329, 480 S.E.2d 538 (1996). Bearing these standards in mind, we proceed to determine whether the trial court committed error.

## III. Discussion

The petitioner asserts that the trial court's refusal to grant his request for a jury trial in connection with the hearing held pursuant to West Virginia Code § 27-6A-6 was error. The language of that statute provides, in pertinent part, as follows:

> If a defendant who has been found to be not competent to stand trial believes that he or she can establish a defense of not guilty to the charges pending against him or her, other than the defense of not guilty by reason of mental illness, the defendant may request an opportunity to offer a defense thereto on the merits before the court which has criminal jurisdiction. . . . If the court of record in its discretion grants such a request, *the evidence of the defendant and of the State shall be heard by the court of record sitting without a jury.*

*Id.* (emphasis supplied). Because this statute does not provide for or contemplate the use of a jury, Mr. Gum argues that West Virginia Code § 27-6A-6 is unconstitutional.

In support of his position, the petitioner contends that he is suffering a significant loss of liberty, as a result of his long-term confinement at a mental health facility. Because this loss of liberty took place without an antecedent proceeding that included a "judgment of his peers," Mr. Gum maintains his constitutional rights have been violated. W.Va. Const. art. III, § 10 ("No person shall be deprived of life, liberty, or property, without

10

due process of law, and the judgment of his peers."). Acknowledging that the nature of the proceeding at issue was a legislative decision, the petitioner theorizes that concerns rooted in judicial economy are the only possible reason for not providing for a jury trial.[26]

As the State correctly recognizes, the statutes contained in chapter 27 of article 6A resulted from the holding in *Jackson v. Indiana,* 406 U.S. 715 (1972), that a defendant may not be committed indefinitely to a mental care facility solely because he or she is incompetent to stand trial. *Id.* at 738. Responding to *Jackson,* our Legislature provided for the commitment of an incompetent individual for a term commensurate with the maximum penalty for the underlying offense. *See* W.Va. Code § 27-6A-3(h). In using the corollary maximum penalty as the ceiling for a period of commitment, our statutory scheme mirrors laws enacted in Ohio, Massachusetts, and Illinois.[27]

While this Court has not previously addressed the nature of proceedings that are held to determine the commitment period for an individual deemed to be incompetent to stand trial and the attendant rights that attach to those proceedings, other courts have

---

[26]Mr. Gum suggests that "[p]erhaps the reasoning of the adoption of the statute was for judicial economy but a similar amount of evidence, witness time, and the court's time would have been expended regardless of whether there was a trial by jury or a bench 'trial' in this case."

[27]*See* Ohio Rev. Code §§ 2945.38, 2945.39 (2010); Mass. Gen. Laws ch. 123, § 17(b) (2003); 725 ILCS 5/104-25 (Supp. 2014).

examined the issues raised in this appeal. In *State v. Williams*, 930 N.E.2d 770 (Ohio 2010),

the Ohio Supreme Court engaged in a thorough analysis involving the "intent-effects" test[28]

and concluded that Ohio's version of West Virginia Code § 27-6A-6 is a civil statute. And,

as a result, the Court in *Williams* determined that "a person committed under the statute

[Ohio Rev. Code § 2945.39] need not be afforded the constitutional rights afforded to a

defendant in a criminal prosecution." 930 N.E.2d at 778.

In reaching its decision in *Williams* that the Ohio statute is a civil statute, the

court considered the fact that the proceeding at issue was designed primarily for the purpose

of protecting the public. *Id.* at 776. Of significance to the court was the statutory omission

of "any indication of an overriding intent to punish or confine criminal defendants." *Id.* As

---

[28]This test requires that

> a court first considers whether the legislature intended the
> statute to be remedial (and therefore civil) or penal (and
> therefore criminal). If the intent was that the statute be penal
> and criminal, then the inquiry ends. However, if the intent was
> that the statute be remedial and civil, then the statute's specific
> effects must be examined. The statute may still be determined
> to be punitive and criminal if its effects negate a remedial
> intention.

930 N.E.2d at 775 (internal citation omitted); *see also Kansas v. Hendricks*, 521 U.S. 346
(1997) (applying intent-effects test with regard to evaluating constitutionality of statute
permitting sexually violent predators who had completed criminal sentences but remained
likely to reoffend based on mental abnormalities or personality disorders to be
institutionalized and finding statute to be civil in nature).

further evidence of public safety being the overarching objective, the Ohio Supreme Court relied upon the statutory requirement that the trial court must "order the least-restrictive commitment alternative available consistent with public safety and the defendant's welfare." 930 N.E.2d at 776-77. The statute, as the court observed,"does not implicate deterrence [a signal of criminal punishment], because a defendant to whom it applies is unlikely, by the very nature of his mental illness, to possess the ability to tailor his behavior to the requirements of the law upon the threat of commitment." *Id.* at 777.

In *People v. Waid*, 851 N.E.2d 1210 (Ill. 2006), the Supreme Court of Illinois rejected the argument that the "discharge hearing" held to determine the sufficiency of the evidence against an incompetent defendant was a criminal proceeding. *Id.* at 1214; *see* 725 ILCS 5/104-25. Explaining that discharge hearings do not implicate the same degree of due process protections available at a criminal trial, the Court observed that the focus at a discharge hearing is the converse of a criminal proceeding:

> In Illinois, a section 104-25 discharge hearing takes place only after a defendant has been found unfit to stand trial. Accordingly, in keeping with due process requirements, a discharge hearing under section 104-25 is "an 'innocence only' hearing, that is to say, a proceeding to determine only whether to enter a judgment of acquittal, not to make a determination of guilt." "The question of guilt is to be deferred until the defendant is fit to stand trial."

851 N.E.2d at 1214 (internal citations omitted).

13

As the Court in *Waid* emphasized, the nature of these statutory proceedings is a focus on innocence rather than on guilt. The defendant is given an opportunity to obtain an acquittal of the underlying criminal charges where the State's evidence is insufficient.[29] The burden of proof further signals that the proceeding contemplated is civil rather than criminal. Significantly, the quantitative level of proof required under West Virginia Code § 27-6A-6 is sufficient evidence and not the criminal standard of requiring evidence of guilt beyond a reasonable doubt.

We have no difficulty concluding that the hearing sanctioned by West Virginia Code § 27-6A-6 is civil in nature. Instead of seeking retribution or deterrence, our statute is directed at the joint purposes of protecting the public and ensuring appropriate treatment for individuals who are both incompetent and criminally violent. *See* W.Va. Code § 27-6A-3(h). The least restrictive environment is mandated and the potential maximum prison sentence serves as a ceiling, rather than a floor, for the treatment period. And, despite the evidentiary proceeding that offers the defendant an opportunity to demonstrate a defense to the pending criminal charges and the possibility to escape future prosecution upon a finding of insufficient evidence, there is no finding of guilt that may result from such a proceeding.

_____

[29]If the State is determined to have introduced insufficient evidence to support a conviction following a hearing pursuant to West Virginia Code § 27-6A-6, the court is mandated to dismiss the indictment and order the release of the defendant from criminal custody.

Given the civil nature of the proceeding authorized by West Virginia Code § 27-6A-6, the due process protections that attach to criminal proceedings such as the right to a speedy trial, an impartial jury, and the confrontation of witnesses are not invoked by such a hearing. Rather than being denied, however, those rights have been temporarily shelved until the defendant regains the competency to stand trial. In the event Mr. Gum regains competency and the State subsequently decides to prosecute him on the pending charges, the requisite due process protections will become operative. *See Spero v. Commonwealth,* 678 N.E.2d 435, 436 (1997) (recognizing that incompetent defendant would have opportunity to confront witnesses against her at trial upon finding of competency); *Commonwealth v. DelVerde*, 496 N.E.2d 1357, 1364 (Mass. 1986) (rejecting notion of permanent deprivation of due process rights, observing that such rights would become operative in event of actual prosecution of criminal charges). We consequently determine that the right to a jury trial does not attach to a hearing requested pursuant to West Virginia Code § 27-6A-6 for the purpose of permitting a criminal defendant, who has been adjudged incompetent, to establish any defenses to the charged offense other than the defense of not guilty by reason of mental illness.[30] Accordingly, we find no merit in the petitioner's assignment of error predicated on the unconstitutional denial of his right to a jury trial.

---

[30]This Court previously ruled in syllabus point one of *Markey v. Wachtel*, 164 W.Va. 45, 264 S.E.2d 437 (1979), that jury trials are not required by our state constitution in an involuntary commitment proceeding.

15

As an alternate assignment of error, the petitioner maintains that the evidence the State presented at the hearing was not sufficient for the trial court to rule that the State had demonstrated he committed second degree murder for commitment purposes. As the trial court correctly articulated, to convict the petitioner of murder in the second degree, the State would be required to prove beyond a reasonable doubt that Mr. Gum did intentionally, maliciously, and unlawfully slay, kill and murder his father on September 19, 2010. On appeal, the petitioner argues the State wholly failed to demonstrate malice. Consequently, he maintains that the State could, if this matter proceeded to trial, only obtain a conviction for voluntary manslaughter.

The State refutes the argument raised by the petitioner on the issue of malice by first recognizing that the trier of fact is permitted to draw certain inferences from the actions taken by a defendant. As this Court explained in *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), "if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it fairly may be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended." *Id.* at 305, 470 S.E.2d at 624. It is well-settled that malice and intent to kill may be inferred from the use of a deadly weapon in circumstances not affording the defendant excuse, provocation, or justification. *See State v. Miller*, 197 W.Va. 588, 609-10, 476 S.E.2d 535, 556-57 (1996).

16

The facts of this case demonstrate that the petitioner and his father, both of whom were intoxicated, were arguing over alcohol. Mr. Gum left the living area where the two had last been drinking together while seated on the couch, went down the hall to the victim's bedroom and retrieved a shotgun. He then went downstairs to his bedroom to locate shells for the shotgun, loaded the gun, and started back up the stairs. When he encountered his father coming down the stairs towards him, he shot him in the chest. Not only did the petitioner admit to pulling the trigger, but he stated that there was no struggle with his father over the gun.

There is no evidence in the record that the petitioner's father threatened him. Similarly lacking is any credible evidence that the petitioner was acting in self-defense. Despite Mr. Gum's post-shooting description of his father being mad and coming at him during the 911 call, the record does not support any suggestion that the petitioner's use of the shotgun was a means of protecting himself from harm. Simply put, the petitioner has failed to raise any basis to refute the application of the inference that obtains from the use of a deadly weapon. *See Miller*, 197 W.Va. at 609-10, 476 S.E.2d at 556-57. As a result, we find no error in the trial court's conclusion that sufficient evidence of second degree murder was introduced for purposes of determining the maximum length of the petitioner's commitment. *See* W.Va. Code § 27-6A-3(h).

17

**IV.  Conclusion**

Based on the foregoing, the decision of the Circuit Court of Lewis County is affirmed.

Affirmed.

18