COMMONWEALTH vs. JOHN P. WHITMAN, THIRD.

Plymouth. October 4, 1999. - February 9, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Practice, Criminal,* Instructions to jury, Presumptions and burden of proof, Assistance of counsel. *Homicide. Malice. Self-Defense. Evidence,* Self-defense, Presumptions and burden of proof.

At the trial of a murder indictment in which the jury convicted the defendant of voluntary manslaughter, error in the judge's initial instruction on malice did not create a substantial risk of a miscarriage of justice in light of the instructions as a whole, including supplemental instructions on murder in the second degree and voluntary manslaughter that correctly communicated the element of intent. [749-755]

At the trial of an indictment for murder in the first degree in which the jury returned a verdict of voluntary manslaughter, no substantial likelihood of a miscarriage of justice arose from the judge's instructions to the jury on self-defense and the Commonwealth's burden of proof, viewing the instructions as a whole. [755-757]

At a criminal trial defense counsel was not demonstrated to have provided ineffective assistance for failure to have objected to asserted errors that did not present a substantial risk of a miscarriage of justice. [757]

INDICTMENT found and returned in the Superior Court Department on September 6, 1994.

The case was tried before *John A. Tierney, J.*

The Supreme Judicial Court granted an application for direct appellate review.

*Wendy H. Sibbison* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant, John P. Whitman, III, was indicted for the stabbing death of Kenneth Palma, the victim. The case was submitted to the jury with instructions on murder in the first degree, murder in the second degree, and voluntary manslaughter. The defendant was convicted of voluntary manslaughter. He was sentenced to a prison term of from sixteen to twenty years. He appealed and we granted the defendant's application for direct appellate review.

The defendant makes three principal arguments on appeal: (1) the jury instructions violated due process by failing to state that the Commonwealth bore the burden of proving a culpable mental state (mens rea) for voluntary manslaughter, i.e., some form of intent; (2) the instructions violated due process by including confusing, mistaken, and contradictory instructions on the law of self-defense and provocation; and (3) trial counsel's failure to object to these errors constituted ineffective assistance of counsel.[1] Because we determine that the instructions, to which there were no objections, taken as a whole did not create a substantial risk of a miscarriage of justice, and because there was no showing of ineffective assistance of counsel, we affirm the conviction.

## I

Undisputed testimony at trial established that the defendant, the victim, and his wife, Pamela, met in April, 1994, and became friends, and that the defendant frequently spent the night at the Palmas' house. Despite their friendship, the defendant and the victim often argued. There was evidence suggesting the victim may have had grounds for jealousy concerning his wife's relationship with the defendant.

On the night of the stabbing, June 21, 1994, the defendant had dinner at the Palmas' house and worked on his car radiator in their yard. Mrs. Palma testified she and her husband had spoken earlier of the tension at home, caused in part by the defendant's presence, and her husband told her the defendant had to go. The victim then opened and closed a knife in his hand and threatened his wife, "Half joking. Half not joking," by her account, that he would "slice" her throat and then kill the defendant if he found out they were "fooling around." The defendant testified that he was present when this statement was made, and testimony at trial would tend to confirm his account.

Mrs. Palma testified she left the house for a walk, but returned when she heard male voices yelling. As she approached she saw the victim and the defendant standing face to face in the yard,

---

[1] The defendant also argues that the question of intent was effectively decided by the jury's verdict, barring retrial of the defendant for voluntary manslaughter on collateral estoppel grounds. Because we determine that a new trial is not warranted, we need not address this argument.

arms flailing.[2] The victim then backed up, put his hand on his left side and said to her, "Pam, I think I am bleeding." The victim stumbled and his wife helped him get to the front porch and yelled for their daughter to dial 911.

The defendant offered the following testimony about the altercation. The victim came out of the house while the defendant was working on his car and chased the defendant with a flare gun, saying he would shoot the defendant if he did not get off the property. The victim eventually went into the house but then came back out and grabbed the defendant from behind, squeezing his neck and trying to choke him.[3] The defendant testified he could not breathe and thought the victim was going to kill him. As the victim was squeezing his neck, the defendant grabbed the knife he had been using to cut radiator hose. The victim asked if he was "going to use it," and the defendant responded, "You're fucking right." Then the defendant took the knife and "stuck it into" the victim. He did not know how many times he struck the victim with the knife; the defendant was not even certain he had stabbed him. He was "just flailing," with the knife, "scared because [the victim] had [him] in such a grip." He thought he struck the victim's sweater. The defendant also testified that he "got him that way right to his chest. . . . And then I just stabbed him this way and I got him into the back from bent over this way . . . ."

The defendant acknowledged that in his videotaped statement to the police at his booking he said he got loose from the victim's grasp, and testified that "[m]aybe that's when I cut him under the arm."[4] The defendant also testified, however, that none of his strikings with the knife, except perhaps the last,

---

[2] A State trooper recounted that Mrs. Palma told him that it looked like the defendant and her husband were "fist fighting" when she first saw them.

[3] The defendant testified that due to an earlier injury that left a large hole in the back of his head he was leery of "physical combat with somebody from behind."

[4] A videotape of the defendant's statement at the time of booking was admitted in evidence, played for the jury during trial, and again, at the jury's request, during their deliberations. On the tape the defendant states: "I got loose from him, that's when I found the knife. . . . When he spun me around and I found the knife, I stuck him with it. I thought he jumped back but I missed him I guess. I tried to stick him again to get him off me . . . I couldn't get him off me. I kicked him. I did everything, but he's so big [and] he had me by the neck." At trial the defendant testified that he "may have" gotten loose, he was not sure. He also said he did not recall cutting the victim under the arm.

caused the victim to let go. The defendant said he then passed out. When he came to, he ran next door and threw the knife in the bushes. When he returned to the house, he saw that the victim was bleeding. He also testified that he was "pretty angry" and could have said to Mrs. Palma, "I don't know why you give a fuck. He never gave a fuck about you." The defendant himself sustained no cuts, scrapes, or injuries.[5]

The victim died on July 1, 1994. The vascular surgeon who operated on him on the night of the stabbing testified that he had been stabbed five times: once in the arm, twice in the back, and twice in the chest. The two chest wounds were "fatal wounds," penetrating five to six inches, injuring the heart. The medical examiner who performed the autopsy testified that the cause of death was the multiple stab wounds, particularly the two that penetrated the heart and left lung.

## II

We turn first to the asserted errors in the jury instructions.

## A

The defendant argues that the judge's instructions to the jury never informed them that voluntary manslaughter includes a culpable state of mind. The defendant urges that the mens rea for voluntary manslaughter is the specific intent to kill.[6] The defendant further asserts that the judge's malice instructions

---

[5]The first officer on the scene thought the defendant had "had a couple of drinks," but was not intoxicated. The defendant also testified that he was taking tranquilizers during this period for his earlier head injury, and took dopamine hydrochloride and methadone treatments for his addiction problem. The judge's charge concerning malice instructed the jury that they could consider any impairment caused by alcohol on the defendant's ability to have the intent described in any of the three prongs of malice.

[6]In contrast to the defendant's argument that our cases and some commentators suggest the mens rea for voluntary manslaughter is the specific intent to kill, or perhaps an intentional infliction of injury likely to cause death, the Commonwealth argues that the cited authorities did not intend "to restrict the application of voluntary manslaughter to situations that satisfied the first or second prong[] of malice [intent to kill; intent to do grievous bodily harm] and to exclude situations that would satisfy the third prong." In dispute is whether in this context the mens rea for voluntary manslaughter includes only the first (or first and second) prong of malice, or all three prongs. The Commonwealth argues convincingly that, if the defendant's assertion were accepted, it would lead to the anomalous result that a murder based on third prong malice could never be reduced to voluntary manslaughter

were flawed in their omission of the Commonwealth's burden to prove absence of mitigating circumstances, and that the instructions improperly explained voluntary manslaughter as "simply" an unlawful killing. Because defense counsel at trial failed to object to the instructions, we review any error in the instructions to determine whether it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Alphas, ante* 8, 13 (1999); *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

The judge's instructions were addressed here to a killing in which the defendant was indicted for murder, but where evidence of mitigating circumstances raised the possibility that the killing was the lesser included offense of voluntary manslaughter. Voluntary manslaughter in this context is a crime that would otherwise be murder if "a killing arises 'from a sudden transport of passion or heat of blood upon a reasonable provocation' or 'upon sudden combat.' " *Commonwealth* v. *Boucher*, 403 Mass. 659, 662 (1989), quoting *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931).[7] In addition, " '[t]he provocation that justifies reasonable action in self-defense also negates a finding of malice in any killing that results from the use of excessive force' in response to the initial provocation." *Ariel A.* v. *Commonwealth*, 420 Mass. 281, 285 (1995), quoting *Commonwealth* v. *Boucher, supra* at 664.[8] See *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998); Model Jury Instructions on Homicide 27 (1999). Thus, "[i]f a person kills another in

---

because of mitigating circumstances. The Commonwealth also asserts, correctly in our judgment, that authoritative statements concerning voluntary manslaughter involving an "intentional killing" or an "intent to kill" are merely "shorthand" references for conduct satisfying any of the three prongs of malice.

[7]Sufficient provocation is provocation of the type which "would be likely to produce in an ordinary man such a state of passion, anger, fear, fright or nervous excitement as might lead to an intentional homicide and, moreover, such as did actually produce such a state in the mind of the slayer." *Commonwealth* v. *Anderson*, 408 Mass. 803, 807 (1990), quoting *Commonwealth* v. *Rooney*, 365 Mass. 484, 494 (1974). Here the defendant testified that he responded as he did because the victim came from behind as he grabbed him by the throat, which also heightened his anxiety because of an earlier head injury. While this testimony could give rise to a claim of self-defense, a rational jury could have found that there was evidence raising the issue of provocation.

[8]The judge's instructions touched on all of these forms of voluntary manslaughter.

the heat of passion, which is occasioned by adequate and reasonable provocation, or in sudden combat, then even though that person had an intent to kill, the killing is designated manslaughter and not murder because of the mitigating circumstances." *Commonwealth* v. *Acevedo, supra.*

The judge twice instructed the jury on manslaughter. The first comprehensive instructions on murder (in the first and second degrees) and manslaughter were given before the jury began their deliberations. Later, in response to a question from the jury concerning the definition of murder in the second degree and manslaughter, the judge gave supplemental instructions. In his initial instructions on murder, the judge properly defined murder in the first degree as requiring that the Commonwealth prove three elements beyond a reasonable doubt: (1) an unlawful killing, (2) malice aforethought, and (3) deliberate premeditation or extreme atrocity or cruelty. See, e.g., *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995).

He then instructed that a conviction of murder in the second degree would require the Commonwealth to prove beyond a reasonable doubt two elements: (1) an unlawful killing and (2) malice aforethought. The judge defined malice aforethought in the context of murder in the second degree to include "an unexcused specific intent to kill or an unexcused specific intent to do grievous bodily harm or an unexcused intent to do an act creating a plain and strong likelihood that death would follow."[9] He thus made clear to the jury that a conviction of murder would require a finding of some form of culpable intent or its equivalent.

The judge did not make clear, however, that where, as here, evidence of provocation has been raised, for a conviction of murder in the second degree the Commonwealth would also have to prove the absence of provocation beyond a reasonable doubt. In a murder case where evidence has raised the possibility of provocation and voluntary manslaughter may be at issue,

---

[9]The judge also properly described malice aforethought similarly for murder in the first degree with extreme atrocity or cruelty, and described malice for murder in the first degree with deliberate premeditation as "an unexcused specific intent to kill." See *Commonwealth* v. *Carlino*, 429 Mass. 692, 697 (1999); *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 394-395 & n.3 (1998).

proof of malice requires proof of the absence of provocation.[10]
See *Commonwealth* v. *Carlino,* 429 Mass. 692, 694 (1999),
quoting *Commonwealth* v. *Acevedo,* 427 Mass. 714, 715 (1998);
*Commonwealth* v. *Boucher,* 403 Mass. 659, 661 (1989). See
also *Ariel A.* v. *Commonwealth, supra* at 286 ("manslaughter
depends on evidence establishing what logically may be referred
to as an additional element not present in murder," provocation
sufficient to mitigate an unlawful killing); Model Jury Instruc-
tions on Homicide 27 (1999) (for murder case in which
voluntary manslaughter is "covered," to prove defendant acted
with malice Commonwealth must prove "absence of certain
mitigating circumstances").

Because in his initial instructions the judge defined malice in
terms of intent to kill, intent to do grievous bodily harm, or
intent to do an act creating a plain and strong likelihood that
death would follow, and did not sufficiently explain that proof
of malice in a context such as this case includes proof of the
absence of provocation, his instructions to the jury were incom-
plete.[11] On the basis of such incomplete instructions concerning
malice, the judge's use of the well-worn formulation that
manslaughter "is the unlawful killing of another without

---

[10]The Commonwealth does not dispute this point, but argues that from the
language of the judge's instructions, "[i]t necessarily followed that in order to
prove malice, the Commonwealth had to disprove the existence of any such
extenuating circumstances," and that "the law does not require the judge to
repeat the same idea at every turn."

[11]It could have been similarly misleading to instruct the jury, as the judge
did, to proceed to consideration of voluntary manslaughter if the Com-
monwealth "has *not* proven beyond a reasonable doubt the two elements
necessary to prove the defendant guilty of second degree murder, that is, an
unlawful killing and it was committed with malice aforethought as I have just
defined for you [i.e., the three prongs of malice for murder] . . . ." Because
voluntary manslaughter in this setting is a crime that would otherwise be
murder except for the evidence of provocation or other mitigating circum-
stances, see *Commonwealth* v. *Boucher,* 403 Mass. 659, 661 (1989), the better
practice would be to instruct the jury that if they found the Commonwealth
*has* proven beyond reasonable doubt the elements of murder, except that the
Commonwealth has not proven the absence of heat of passion on reasonable
provocation or similar mitigating circumstances, then the jury would be justi-
fied in finding the defendant guilty of voluntary manslaughter. See *Com-
monwealth* v. *Acevedo,* 427 Mass. 714, 715-716 (1998). The Commonwealth
does not dispute that for a manslaughter conviction here proof of the elements
of murder except for evidence of mitigating circumstances must be shown, but
argues that "[a]s a whole, for a finding of manslaughter, the charge effectively
required proof of murder and malice but for the extenuating circumstances."

malice," *Commonwealth* v. *Lussier*, 333 Mass. 83, 92 (1955); *Commonwealth* v. *Webster*, 5 Cush. 295, 304 (1850), standing alone, could have given the jury the misimpression at this point that a conviction of voluntary manslaughter required the Commonwealth to prove beyond a reasonable doubt only one element — an unlawful killing, without any need to find some form of intent.[12]

Voluntary manslaughter is, however, "an *intentional killing*, which is mitigated by extenuating circumstances" (emphasis in original). *Commonwealth* v. *Squailia*, 429 Mass. 101, 109 (1999). See *Commonwealth* v. *DelVerde*, 398 Mass. 288, 297 n.5 (1986), quoting *Commonwealth* v. *Webster*, *supra* (manslaughter involves unlawful killing; voluntary manslaughter is "when the act is committed with a real design and purpose to kill," but is mitigated by sudden passion based on provocation).[13] See also 2 C. Torcia, Wharton's Criminal Law § 155 (15th ed. 1994) ("Voluntary manslaughter is an intentional killing in the heat of passion as a result of severe provocation"); 2 W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 7.10, at 252 (1986) ("[v]oluntary manslaughter in most jurisdictions consists of an intentional homicide committed under extenuating circumstances . . .").[14] If these instructions had comprised all of the judge's charge concerning voluntary manslaughter there might have been enough doubt about whether the jury sufficiently understood the required elements

---

[12]Shortly after defining malice aforethought solely in terms of the three prongs of malice, the judge twice stated that "manslaughter is *simply* the unlawful killing by one person of another without malice aforethought" (emphasis added). Several other times the judge stated that manslaughter was an unlawful killing, without any reference to an intentional killing.

[13]Involuntary manslaughter, in contrast, involves an unintentional unlawful killing. See *Commonwealth* v. *Catalina*, 407 Mass. 779, 783 (1990); *Commonwealth* v. *DelVerde*, 398 Mass. 288, 297 n.6 (1986); *Commonwealth* v. *Webster*, 5 Cush. 295, 304 (1850). See also 2 W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 7.12, at 277 (1986).

[14]Although an essential element of voluntary manslaughter is that the killing is intentional, we do not say that there must be proof of a specific intent to kill for a conviction of voluntary manslaughter. See note 6, *supra*; *Commonwealth* v. *DelVerde*, *supra* at 297-298; 2 W.R. LaFave & A.W. Scott, Jr., *supra* at § 7.10(a), at 252-254.

of the crime to warrant reversing the conviction.[15] However, the judge expanded on his explanation of voluntary manslaughter. In both his initial and supplemental instructions to the jury, the judge linked heat of passion and provocation to voluntary manslaughter in an intentional killing:

> "Provocation sufficient under the law to reduce an intentional killing to voluntary manslaughter is provocation such as is likely to produce in an ordinary person that state of passion, anger, fear, fright or excitement as might lead to an intentional homicide and does, in fact, and actually produces that state of mind in the defendant."[16]

In addition, in his supplemental instructions he repeated that "[i]n order for a killing *which would otherwise be murder* to be reduced to voluntary manslaughter there must be proof of adequate provocation. . . . The recognized bases for provocation in Massachusetts are combat, passion, heat of blood" (emphasis added).[17] Significantly, it was near the end of his supplemental instructions to the jury, one of the last things the jury heard before rendering their verdict. Because the judge here properly identified voluntary manslaughter in this context with a killing that would otherwise be murder except for evidence of mitigating circumstances, he effectively linked the crime of manslaughter back to proof of the mens rea of murder.

---

[15]We note that the judge was navigating this convoluted area of the law without the aid of the Model Jury Instructions on Homicide, *supra,* which were approved nearly three years after the trial.

[16]In his early instructions on malice in connection with murder in the first degree, the judge had instructed that "[a]ny intentional killing of a human being without legal justification or excuse, with no extenuating circumstances sufficient in the law to reduce the crime to manslaughter, is malicious within the meaning of malice aforethought."

[17]The defendant rightly complains that these instructions incorrectly explain proof of provocation "solely in affirmative terms." In fact, such a killing would be reduced to voluntary manslaughter if the Commonwealth *fails to prove absence* of provocation beyond a reasonable doubt. See *Commonwealth v. Acevedo,* 427 Mass. 714, 715-716 (1998). Because there was no conviction of murder here, however, the judge's misstatement constitutes harmless error. For the voluntary manslaughter conviction, if the jury believed the Commonwealth had affirmatively proved adequate provocation as the instructions incorrectly required, then the jury must have necessarily believed the Commonwealth had not proved the absence of adequate provocation.

In their totality the instructions communicated that voluntary manslaughter involves some form of intent. See *Commonwealth* v. *Richardson,* 429 Mass. 182, 185 (1999), quoting *Commonwealth* v. *Raymond,* 424 Mass. 382, 386 (1997) ("We look to the charge as a whole to determine whether it fairly instructs the jury").

The defendant did not object to any of these instructions. In considering whether the shortcomings of the judge's instructions, when viewed in the context of the instructions as a whole, created a substantial risk of a miscarriage of justice, we are cognizant of the strength of the evidence against this defendant. The thrust of the defense was that the defendant acted in self-defense — a matter that we address below. In these circumstances, even if the judge initially had given more precise instructions concerning voluntary manslaughter, we cannot conclude that the jury's result in this case might have been otherwise. See *Commonwealth* v. *Alphas, ante* 8, 13 (1999), quoting *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. 10, 21 (1986). We conclude that the shortcomings in the judge's instructions did not create a substantial risk of a miscarriage of justice.

B

The defendant also claims there are errors in the self-defense instructions and argues that the cumulative effect of the errors violated due process. Once there is evidence of self-defense, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant did not act in self-defense.[18] *Commonwealth* v. *Johnson,* 426 Mass. 617, 620 (1998), citing *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 687-688 (1976). There was evidence here of self-defense. See note 7, *supra.*

Throughout the instructions, the judge repeatedly told the jury that the burden was on the Commonwealth to prove all the elements of the case against the defendant. The judge explained that an unlawful killing was one not excused by self-defense,

---

[18]The Commonwealth argues that any improper shift in its burden to prove absence of self-defense would have been harmless error if the jury based their manslaughter conviction on the Commonwealth's affirmative proof of excessive force in self-defense. This argument is unavailing in this case. The judge gave instructions on both heat of passion, in connection with provocation, and excessive force in self-defense theories of manslaughter, and it is therefore not clear that the jury's verdict was based on excessive force in self-defense.

for example, and told the jury that the burden was on the Commonwealth to prove beyond a reasonable doubt that the defendant unlawfully killed the victim. The judge specifically emphasized several times that where evidence of self-defense is present, the Commonwealth must prove beyond a reasonable doubt that the defendant did not act in self-defense. See *Commonwealth* v. *Doucette*, 391 Mass. 443, 452 (1984) (judge need not restate Commonwealth's burden of proof at each turn); *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846 (1980) (same). The judge also properly stated that the defendant was privileged to use force to defend himself, and that the burden was on the Commonwealth to prove beyond a reasonable doubt that the force used was excessive.[19]

The defendant complains, however, that in several instances the judge's instructions appeared to shift the burden to the defendant to prove he acted in self-defense. The defendant complains, for example, that the judge instructed the jury that:

> "*If you find that the defendant was entitled to raise the defense of self-defense,* there can be no malice. It would automatically reduce the offense from murder to manslaughter *providing you find* that there was *an unlawful killing without justification or excuse* and that there was force used more than reasonably necessary" (emphasis added).

Although the use of "finding" language in connection with self-defense instructions is to be avoided, see *Commonwealth* v. *Mejia*, 407 Mass. 493, 495-496 (1990), the jury could reasonably have understood the first sentence here as merely proper instructions that the jury must decide there is some evidence of self-defense in order to raise the issue of the Commonwealth's burden to prove absence of self-defense. The second sentence adequately conveys that, if the Commonwealth affirmatively proves excessive force in self-defense, a verdict of voluntary manslaughter is warranted.

---

[19]The defendant argues that the judge's instructions did not make clear that the Commonwealth could not go on to prove excessive force in self-defense until it had failed to prove the absence of self-defense. We cannot fault the judge in this respect. If the Commonwealth affirmatively proves excessive force in self-defense, as it must, see *Commonwealth* v. *Niemic*, 427 Mass. 718, 722 (1998); *Commonwealth* v. *Koonce*, 418 Mass. 367, 370 (1994), absence of self-defense has obviously not been proved, which should be evident to the jury.

We agree with the defendant that a few of the judge's instructions, viewed in isolation, could have given the jury the impression that the burden was on the defendant to prove self-defense. Because the judge repeatedly stressed that the burden was on the Commonwealth to prove absence of self-defense, we see no substantial risk of a miscarriage of justice "looking at the instructions as a whole." *Commonwealth* v. *Lapointe*, 402 Mass. 321, 328 (1988).

### III

Finally, the defendant argues that because defense counsel failed to object to these asserted errors, there was ineffective assistance of counsel. We judge claims of ineffective assistance of counsel by determining "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that . . . expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Before the approval of the Model Jury Instructions on Homicide in August, 1999, we have sanctioned, from time to time, different formulations of the core principles — in particular concerning issues of mens rea in voluntary manslaughter. Aspects of the requests for instructions on voluntary manslaughter by defense counsel mirrored some of the formulations we have approved. "We will not reverse a conviction on this basis unless the defendant shows 'that better work might have accomplished something material for the defense.' " *Commonwealth* v. *Pope*, 392 Mass. 493, 499 (1984), quoting *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). We have already concluded that in the context of this trial an inference that the jury's result might have been otherwise, but for any error, is not sustainable. In these circumstances we cannot conclude that trial counsel was ineffective in failing to object to these asserted errors at trial. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 624-625 n.4 (1994) ("If an omission of counsel does not present a substantial risk of a miscarriage of justice . . . there is no basis for an ineffective assistance claim under either the Federal or the State Constitution"). Consequently, the defendant's ineffective assistance of counsel argument is unavailing.

*Judgment affirmed.*