## COMMONWEALTH *vs.* DAVID JONES.

No. 08-P-19.

Middlesex. April 7, 2009. - August 21, 2009.

Present: DUFFLY, BROWN, & McHUGH, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Lesser included offense, Voluntariness of statement. *Intent. Evidence,* Prior misconduct, Medical report, Qualification of expert witness, Voluntariness of statement, Result of illegal interrogation, Polygraph test.

There was no merit to a criminal defendant's arguments that a Superior Court judge erred in instructing the jury on voluntary and involuntary manslaughter as a lesser included offense of murder, or that the instruction, which tracked approved and recommended language, was flawed. [40-42]

At a murder trial, the judge properly instructed the jury on the limits on their use of evidence of the defendant's prior bad act, and any error was ameliorated by the defendant's offensive use of the evidence. [42-43]

Where the evidence at a murder trial did not fairly raise the possibility of accident, the defendant was not entitled to an instruction on accident, and therefore, the inclusion of accident with respect to an instruction on manslaughter provided the defendant with more protection than afforded by the law. [43]

The judge at a murder trial properly excluded, as hearsay, an autopsy report, and likewise properly excluded evidence proffered for the impermissible purpose of bolstering an expert witness's credibility. [43-44]

A Superior Court judge properly denied the criminal defendant's motion to suppress his statement to police regarding a murder, where a display in the interview room of evidence intended to suggest falsely that the police had highly inculpatory evidence did not undermine the voluntariness of the defendant's statement, given that the defendant steadfastly adhered to an exculpatory explanation of his interactions with the victim, and given that the police made no references, overt or otherwise, to the displayed evidence. [44-45]

At a criminal trial, the judge did not err in refusing to instruct the jury regarding an unrecorded interrogation of the defendant, where the defendant was neither in custody nor in a place of detention when he gave a statement to police; further, even assuming that such an instruction should have been given, no error occurred, where the judge's instructions to the jury properly conveyed to them the issue of the voluntariness of the defendant's statement; finally, the defendant failed to demonstrate prejudice arising from the judge being the one to determine whether the defendant was in custody. [45-46]

At a criminal trial, the judge did not abuse her discretion in denying the defendant's motion for a mistrial based on a single reference in a recorded statement to the defendant's agreeing to take a polygraph examination, which recording was played once for the jury before being redacted. [46]

INDICTMENT found and returned in the Superior Court Department on September 7, 2000.

A pretrial motion to suppress evidence was heard by *E. Susan Garsh*, J., and the case was tried before *Elizabeth B. Donovan*, J.

*Dennis Shedd* for the defendant.

*Loretta M. Lillios*, Assistant District Attorney (*Richard D. Grundy*, Special Assistant District Attorney, with her) for the Commonwealth.

BROWN, J. After a jury trial in the Superior Court on an indictment charging murder in the first degree, the defendant was convicted of voluntary manslaughter. We affirm.

The offense occurred on or about July 2, 1975, at which time the defendant was sixteen years old, and the victim was fourteen years old. The victim was initially believed to have died from natural causes, namely a viral heart infection, or myocarditis. In 1997, the victim's body was exhumed and a new autopsy was conducted by Dr. Richard Evans, chief of the medical examiner's office.[1] Evans testified that the photographs taken in 1975 showed petechial hemorrhages (burst vessels from increased blood pressure) on the victim's face, and particularly around her eyes, which he explained are usually associated with asphyxial deaths. Evans also noted that the photographs depicted what was described in the 1975 autopsy report as bruising on the victim's neck, as well as multiple scratches on the victim's face, including what appeared to be marks made by fingernails digging into her skin on the side of her nose. After conducting the autopsy and finding evidence of a hemorrhage in the victim's neck muscle and petechial hemorrhages on the surface of the heart and lungs, Evans rendered an opinion that the victim had died from "asphyxia by compression of the neck" and that "it [was] very likely that

[1]The 1975 death certificate listed "Interstitial Myocarditis and Cardiac Decompensation" as the cause of death. The 1975 medical examiner, Dr. Thomas Devlin, and pathologist, Dr. Nolton Bigelow, had died by the time of trial.

Commonwealth *v.* Jones.

there's an element of chest compression and likely smothering along with the neck compression."

The defendant was interviewed by police in 1997. He initially denied any memory of the victim or her family (the Gilberts), but then acknowledged he had been with her on the night in question. He said they had been kissing and rolling around on the golf course, where her body was found the next morning, but that they had parted company on good terms and separately walked home.

The defense theory relied on the original pathologist's conclusion that the victim's death was caused by a viral heart infection. In support of that theory, the defense proffered an expert, Dr. Gerald Feigan, who gave an opinion that myocarditis could not be ruled out based on the insufficient sampling of the heart conducted by the government's witnesses. He also suggested that the hemorrhage in the neck muscle could have been caused by the branches on which the victim was found lying.[2] The defendant did not testify.

We address the defendant's myriad claims of error seriatim, splicing in additional relevant facts where appropriate.

1. *Voluntary manslaughter instruction.* At the defendant's request[3] and over the Commonwealth's objection, the judge instructed the jury on voluntary (and involuntary) manslaughter.[4] The judge correctly told the jury that to prove voluntary manslaughter, the Commonwealth must prove "an intentional infliction of injury likely to cause death, which causes death" and "the defendant acted unlawfully." See, e.g., *Commonwealth v. Ware,*

---

[2] There was evidence that only "slight pressure" was needed to cause death by asphyxia. There was also evidence that the defendant and the victim had been rolling around on the ground. The defendant suggested to the jury that the rolling around could have caused sufficient pressure to be exerted on the victim's neck, thereby negating any intent by the defendant to cause her death.

[3] In fact, the judge conducted a colloquy with the defendant to ensure that he understood that absent his waiver of the statute of limitations, an instruction on manslaughter might be precluded because a conviction on that offense was time barred. At the conclusion of the colloquy the judge found that the defendant knowingly and voluntarily waived any right to claim that the statute of limitations for manslaughter had expired.

[4] See Massachusetts Superior Court Criminal Practice Jury Instructions § 2.6.1 (Mass. Cont. Legal Educ. 1999).

438 Mass. 1014, 1015 (2003). The defendant did not object to this instruction.

On appeal, the defendant argues that manslaughter, as charged here, is not a lesser included offense of murder because it contains elements that murder does not. The defendant's claim rests on the novel theory that murder, and more specifically, the third prong of malice, and voluntary manslaughter, do not share the same mens rea element. The defendant contends, without citation to any authority, that manslaughter requires a "specific intent" to inflict an injury likely to cause death, whereas the third prong of malice requires only general intent to do an act. *Commonwealth* v. *Boateng*, 438 Mass. 498, 515 (2003).

The defendant's contention that the mens rea requirement for voluntary manslaughter requires different or more exacting proof than that required for any of the three prongs of malice is off the mark. That argument has been addressed and soundly rejected by the Supreme Judicial Court in *Commonwealth* v. *Whitman*, 430 Mass. 746 (2000). There, the defendant claimed that the judge's instruction on voluntary manslaughter was fatally flawed because it never informed the jury that the mens rea for voluntary manslaughter is the specific intent to kill. *Id.* at 749. The court indicated that regardless of whether cases in this Commonwealth may intimate that the mens rea for voluntary manslaughter is the specific intent to kill or the intentional infliction of injury, those authorities did not intend "to restrict the application of voluntary manslaughter to situations that satisfied the first or second prong of malice . . . and to exclude situations that would satisfy the third prong." *Id.* at 749 n.6. The court agreed with the Commonwealth that if such "[an] assertion were accepted, it would lead to the anomalous result that a murder based on third prong malice could never be reduced to voluntary manslaughter because of mitigating circumstances." *Ibid.* The court further noted "that authoritative statements concerning voluntary manslaughter involving an 'intentional killing' or an 'intent to kill' are merely 'shorthand' references for conduct satisfying any of the three prongs of malice." *Ibid.*

The defendant also argues that voluntary manslaughter cannot be a lesser included offense of murder (third prong of malice) because the former requires proof of an intent to inflict an injury while the latter does not. The argument is disingenuous.

The third prong of malice requires an *intent to do an act*, where, "in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong)." *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992). Given that the intended act in the third prong of malice must result in death, it cannot rightly be argued that such intent does not *include* an intent to inflict injury, the manslaughter requirement.

Finally, the defendant argues that the manslaughter instruction was flawed because it included the statement that "if the Commonwealth fails to prove each of these [two] elements . . . you must not convict the defendant of voluntary manslaughter." The defendant argues that the judge should have said, "if at least one of these elements has not been proven . . . , you must not convict the defendant." The judge's instruction tracked the language approved and recommended by the Supreme Judicial Court in Massachusetts Superior Court Criminal Practice Jury Instruction § 2.6.1 (Mass. Cont. Legal Educ. 1999). We decline the defendant's invitation to alter that formulation.

2. *Prior bad act.* The defendant argues that the judge's limiting instruction concerning the use of evidence that the defendant broke into the victim's home about nine months after the victim's death and assaulted her sister, Gayle Gilbert, improperly permitted the jury to consider that evidence as proof of the defendant's intent and bad character. That evidence was admitted to rebut the defendant's initial statement to police that he did not remember the Gilberts. The judge's limiting instruction, given at various stages of the trial, permitted a broader use of the evidence than that for which it was admitted. On the last occasion, however, the judge unequivocally stated that the evidence "was introduced on . . . a very limited basis. [It] was introduced only on the issue of the identity of the Gilbert family, whether or not the defendant . . . knew the Gilbert family." This was the last word the jury heard on the subject and we have no basis for concluding they did not properly limit the evidence. See, e.g., *Commonwealth* v. *Wojcik*, 43 Mass. App. Ct. 595, 611 (1997).

Moreover, any error was ameliorated by the defendant's offensive use of the evidence to argue that the defendant felt guilt

and shame over the incident with Gayle Gilbert and that that incident, rather than his relationship with the victim, was the reason he was reluctant to admit to police that he knew the Gilbert family.[5] In addition, the acquittal of the defendant on the charges of murder in the first and second degree bolsters our conclusion that the jury were not unduly swayed by this evidence.

3. *Accident instruction.* On appeal, the defendant argues that not only did the judge fail to instruct on accident, but she removed from the jury's consideration whether the killing was excused. With respect to murder in the first and second degree, the judge instructed the jury that "[t]he evidence in this case *does not raise* an issue of whether the killing was excused" (emphasis added). When the judge defined unlawful killing as an element of voluntary manslaughter and involuntary manslaughter, however, she instructed the jury that "a killing may be excused, for example, in the case of self-defense, defense of another, or accident." In neither instance did the judge negate the possibility of excuse with respect to either theory of manslaughter.[6]

Because the evidence at trial did not fairly raise the possibility of accident, the defendant was not entitled to an instruction on accident. According to the defendant, the last time he saw the victim she was conscious, precluding any inference that their earlier romp on the ground resulted in an "accidental" loss of consciousness that led to her death. See note 2, *supra.* The inclusion of accident with respect to the manslaughter instruction therefore provided the defendant with more protection than afforded by the law. See *Commonwealth* v. *Clemente*, 452 Mass. 295, 321 (2008). In any event, the jury's acquittal of the defendant on the murder charges confirms our conclusion that any error did not unduly prejudice the defendant.

4. *Exclusion of 1975 autopsy report and first pathologist's*

---

[5]Notably, the defendant substantially benefited from the Commonwealth's failure to offer in evidence a truly prejudicial and ostensibly relevant prior bad act. The defendant's ex-wife described an incident in 1981 in which the defendant was drunk and got in a fight with her. He pushed her down, sat on her chest, and choked her by putting his hands on her neck. The evidence was potentially relevant to show a pattern of conduct. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986); Mass. G. Evid. § 404(b) (2008-2009).

[6]The prosecutor brought this discrepancy to the judge's attention at the conclusion of the instructions, but the judge apparently concluded that no further instruction was required.

*credentials.* The defendant's claim that the judge improperly excluded the 1975 autopsy report is without merit. As recently as 2008, the Supreme Judicial Court made clear that an autopsy report constitutes inadmissible hearsay. See *Commonwealth* v. *Nardi,* 452 Mass. 379, 393-394 (2008). Even if defendant could persuade us that the unusual circumstances of this case warrant a different result, he cannot show prejudice because virtually the entire 1975 autopsy report was put in evidence through Evans's testimony.

Similarly, there was no error in the exclusion of a transcript offered by the defendant from an unrelated proceeding in which Bigelow, the 1975 pathologist, testified to his credentials. The defendant proffered this evidence for the impermissible purpose of bolstering Bigelow's credibility and not as a foundation for opinion evidence. See Brodin & Avery, Massachusetts Evidence § 6.24 (8th ed. 2007); *Commonwealth* v. *Frangipane,* 433 Mass. 527, 533 (2001).

5. *The defendant's statement.* The defendant challenges the denial of his pretrial motion to suppress his statement on grounds of voluntariness. He claims that the voluntariness of his statement was fatally undermined by the presence of suggestive — albeit fake — evidence that police placed in the interview room.

The interview began at about 3:00 P.M., in an employee lounge of an office building that included two six-foot tables placed together, chairs, some kitchen appliances, and a soda machine.[7] Approximately eight feet from the head of the table, the police placed a clear plastic bag containing a white bra and another clear plastic bag containing a white sweater. Several manilla file folders that contained crime scene photographs and an aerial photograph of the golf course were placed with the clothing. One file had the letters DNA written on its front. The police had recovered no DNA evidence and the clothes had no evidentiary connection to the case. Although these items were clearly visible during the interview, the police never referred to them.

The defendant arrived at the building on his own accord, agreed to be interviewed, was advised of his Miranda rights at the outset of the conversation, and was allowed to leave when

---

[7]We take the facts in this section from the memorandum of decision and order entered by the judge (not the trial judge) who decided the defendant's motion to suppress his statement.

Commonwealth *v.* Jones.

the interview was concluded, about three hours later. During the interview the defendant acknowledged that he had been with the victim on the night in question but denied any wrongdoing.[8]

Contrary to the defendant's claim on appeal, the motion judge properly concluded that displaying the objects that were intended to suggest falsely that the police had highly inculpatory evidence, did not render the defendant's statements involuntary. See, e.g., *Commonwealth* v. *Selby,* 420 Mass. 656, 664 (1995). That the police tactics were not coercive is most clearly evident from the defendant's steadfast denial of wrongdoing.

Even though the defendant eventually acknowledged that he had been with the victim shortly before she died, he adamantly maintained that when they parted company, they were on good terms and she was healthy and well. The statement demonstrates a calculated effort to provide an innocent explanation to cover the possibility that trace evidence from the scene might be linked to him, while simultaneously deflecting any criminal responsibility for the victim's death. The exculpatory explanation evinces voluntariness because it indicates not only a rational intellect but that the defendant was aware that his remarks to the police could have adverse consequences. See *Commonwealth* v. *Wolinski,* 431 Mass. 228, 232 (2000).

Moreover, unlike in the case relied upon by the defendant, *Commonwealth* v. *DiGiambattista,* 442 Mass. 423, 434-440 (2004), the police made no references, overt or otherwise, to the displayed evidence, nor was the display combined with any suggestion of leniency, a combination that the court in *DiGiambattista* found "particularly troublesome." *Id.* at 435. In sum, the motion judge's conclusion that the defendant's statements were voluntarily made was not error.

The defendant's related challenge to the trial judge's instruction pursuant to *DiGiambattista* is also without merit. Because the defendant was neither in custody nor in a place of detention when he spoke to police, he was not entitled to an instruction

[8]Toward the end of the interview, the defendant agreed to allow the police to make a recording. Part of the recording involved a police officer summarizing what he remembered the defendant to have said; the defendant agreed with the summary. The other part of the recording contained questions by the police officer and answers by the defendant.

on unrecorded interrogations. *Id.* at 425 (only when "an unrecorded custodial interrogation, or an unrecorded interrogation conducted at a place of detention" occurs must jury be cautioned about accuracy of any resulting statement). See *Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001).

In any event, even if we were to conclude that the instruction should have been given, no error has been made to appear. When an interrogation is not recorded, the *DiGiambattista* court set forth a requirement that jurors must be informed that "they should weigh evidence of the defendant's alleged statement with great caution and care. Where voluntariness is a live issue and the humane practice instruction is given, the jury should also be advised that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt." *Commonwealth* v. *DiGiambattista, supra* at 448. Here, the judge not only repeated the *DiGiambattista* language ("You should weigh the unrecorded statement with great caution and care"), she added the clause, "when you are determining whether the statement was voluntary." The language merely reiterated what was at issue in *DiGiambattista*, namely, the voluntariness of a confession.

Finally, the defendant argues that the judge, not the jury, should have determined whether the defendant was in custody as a prerequisite to giving the *DiGiambattista* instruction. Even if it were error, the defendant has not demonstrated how it was unduly prejudicial.

6. *Polygraph evidence.* There is also no merit to the defendant's claim that the trial judge should have allowed his motion for a mistrial because his single statement that he agreed to take a polygraph exam was inadvertently included on the recorded portion of his statement that was played once for the jury before it was redacted. *Commonwealth* v. *Gallagher*, 408 Mass. 510, 517-518 (1990). There was no abuse of discretion in denying the motion for a mistrial. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 435 (2002).

*Judgment affirmed.*